Woodruff, J. (Dissenting.)
I concur with my brethren in their views respecting the right of the defendants, upon the facts found in this case, to refuse payment of the check for ten thousand dollars held by plaintiffs; but, in regard to the claim of the plaintiffs to relief from the consequences of the arrangement made with the defendants in order to obtain the payment of that check, I am constrained to dissent from the opinion pronounced herein.
The difference, however, between myself and my brethren is not so much in respect to the existence and soundness of the rule by which the case, in my judgment, ought to be governed, as on the question whether the facts of the present case call for its application.
I believe we are fully agreed that the doctrine of Courts of of Equity is well settled, that a mutual mistake of facts which are material, which enter into the consideration of the parties, and are in that sense a cause of a contract, is a sufficient gound to avoid it.
This general rule is not, so far as I understand, denied by the defendants’ counsel.
Under such circumstances, I do not deem it necessary to cite authorities to a rule often, and, I may say always, recognized as one especial head of equity jurisdiction, and, in appropriate cases, *486 acted upon with scarcely less freedom by courts of law, both in England and in this country. (See 1 Story’s Eq. Jur. § 141 and onward, and cases in notes; 1 Spence Eq. Jur. p. 632 and onward; Fonbl. Eq. 116, etc., 120; and cases at law, in application of this rule, might be greatly multiplied. Some are cited in the opinion of Mr. Justice Hoffman in this case, at Special Term; and see. Story on Sales, § 145 and onward, and cases in notes; and Story on Contracts, § 419, etc., and cases in notes; Wilkinson v. Johnson, 3 B. & C. Rep. 429; Kelly v. Solair, 9 Mees. and W. Rep. 54, and cases cited; Merkle v. Hatfield, 2 J. R. 455; Canal Bank v. The Bank of Albany, 1 Hill Rep. 287.)
As, in my opinion, the plaintiffs are entitled to relief upon the doctrine above stated, I deem it also unnecessary to inquire whether, in strictness, the transaction between these parties was to be deemed a sale of stock by the defendants to the plaintiffs, or whether there was in the transaction an implied warranty of the genuineness of the stock. Still less is it necessary to impute to the defendants any intentional misrepresentation or want of entire fairness in their dealing with the plaintiffs.
It is sufficient for my purpose to take the facts as found by the Justice before whom the action was tried; and if they show a bargaining between these parties—a consideration moving to each in the arrangement which they had with each other, and an entire mistake or error in regard to the subject to which the arrangement related, and one which vitally affected the contract as one of its inducements, the general rule above stated seems to me to require that the contract be rescinded, and the' parties be restored to the position in which they were before it was made; and this accords with what I cannot but claim to be eminently just.
The inquiry, therefore, which I deem it alone necessary to consider, is, whether the facts found establish a case, within the rule referred to ?
The very basis and ground of the negotiation (so far as related to stock) was, that the defendants held 370 shares of stock in the New York and New Haven Railroad Company.
This was the distinct and unqualified representation of the defendants to Mr. Bement. No certificate was produced or exhibited; no confidence in any other title than that of the defendants was directly or impliedly invited.
*487 In truth, at that very time, whatever evidence of title was in the possession of the defendants, represented, not that Schuyler, but that the defendant as president, or the bank, was the holder of 370 shares of such stock, in precise accordance with the representation made to Mr. Bement.
However honestly the representation was made, that representation was the starting point in the negotiation which ensued; it was in mutual belief that there was stock, real stock, and just 370 shares thereof, that the parties treated together on the subject.
In that mutual belief, and, as the result has shown, under that mutual mistake, in regard to a matter that formed the inducement to Mr. Bement, and the only inducement to what followed, what was done?
“An arrangement was made” between them, subject only to the consent of the Messrs. Schuylers, for the payment to the defendants, by the plaintiffs, of $25,000, and the transfer to the plaintiffs, in consideration thereof, of the 370 shares of stock, and, as a consequence resulting from this arrangement, (the whole sum due to the bank, the defendants, being paid to them,) the amount of the check held by the plaintiffs, being then on deposit, would be relieved from any claim of the defendants, could properly be paid, and would be paid.
Here, then, was a mutual mistake, and an arrangement founded therein. It was a mistake in a particular vital to the transaction. I need not pause to argue that, had the actual character of the stock been known, the plaintiffs would not have consented to it, and the defendants would not have, for a moment, supposed such an arrangement possible.
Was there a consideration moving between the parties, prejudicial to the plaintiffs and beneficial to the defendants ? The answer is, unhesitatingly and incontrovertibly, yes, both.
The plaintiffs parted with their money. The defendants received full satisfaction of their claims. Assuming, for the purpose of this last inquiry, that the stock was all that the parties believed it to be, still there was consideration, and a consideration beneficial to the defendants, in this arrangement; they received certain payment. True, they supposed the debt well secured; and, if the stock was genuine, they had good reason for their belief; nevertheless, there was benefit to them in the actual payment, *488 "which at once relieved them from all the possible hazards of depreciation in value, or other event which could affect their position.
Besides, when the relation which the plaintiffs and the defendants at that moment bore to each other is taken into view, the consideration and the motives prompting this arrangement become even more important.
The plaintiffs held a check of $10,000, drawn by the Schuylers upon the defendants. It was drawn on the 29th day of June, and an actual deposit was on that day made by the Schuylers, sufficient to make their account good-—the balance to the credit of the Schuylers was sufficient for its payment. In the negotiation referred to, the plaintiffs were actually claiming, that, although nothing was said by the Schuylers, on making the deposit, amounting to a specific appropriation of the money, with the defendants’ assent, to this particular check, yet that the deposit was. in fact made for the very purpose of meeting the check, and, therefore, that the plaintiffs were entitled to have that check paid, and the defendants had no right to withhold that money; and further, that the defendants had no right to appropriate that money to the payment of the notes which they held.
Now, although we are of opinion, as already suggested, that, in point of law, this claim of the plaintiffs could not, upon the facts proved on the trial, have been sustained, still such was the claim urged upon the defendants then and forcibly urged by the plaintiffs’ counsel down to this time. It was • at the time of the negotiation an existing, pressing claim, and a claim of such importance and plausibility that it might very properly enter into the consideration of the parties; and by the arrangement then made that claim was fully adjusted and the defendants were relieved.
The circumstance that, if that claim had been litigated, we are of opinion that the plaintiffs must have failed, does not change the aspect of the case in this respect. The very purpose of all arrangements, of this description, is to avoid controversy and litigation.
There-was, then, in the arrangement then agreed upon, a consideration on both sides—a benefit to the defendants, a prejudice to the plaintiffs; that is to say, a parting with their money upon the chance of realizing it again, on the mutual assumption that the stock was the genuine stock of the railroad company.
*489 What then remained to be done ? The consent of the Schuylers was to be procured. Not because any benefit was to result to the Schuylers. Not because it was supposed that this was imposing upon the plaintiffs any further actual burden, but, simply, that it might not be in the power of the Schuylers, afterwards, to say to the defendants, you have dealt with the securities, pledged by us with you, as if they were your own, without our assent; in other words, to relieve the defendants from any liability to the Schuylers in regard to the transactions. >
The consent was procured in the form of a distinct direction to the defendants to do what they had arranged to do, subject to such consent.
It is not warranted by any facts found, and it seems to me to do violence to the character of the transaction as it appears upon the evidence, or finding of the Judge, to say by way of supposition, or even to imagine that this consent was the result of a negotiation between the plaintiffs and the Schuylers, by which the plaintiffs became purchasers of the stock from them, or that it was any thing whatever other or more than the procurement of the Schuylers’ assent, such as the defendants deemed reasonable for their own protection as against the Schuylers—an assent to an arrangement already made, only subject to such assent—one which did not in any wise prejudice the Schuylers—one for assenting to which they could not, upon any equitable ground, ask to be paid one penny, and which they had no apparent motiveto disapprove.
Under such circumstances, it seems to me that it would be doing violence to the obvious character of the transaction, to place any stress upon the idea that possibly the negotiation between the plaintiffs and the Schuylers proceeded upon a sale from the latter to the former, which converted the transaction into a dealing between the plaintiffs and the Schuylers in respect to this stock. Nothing indicates that such was the actual fact, and if there was any such dealing it should have been proved by the defendants.
But more than this, if the Messrs. Schuylers had been brought into the presence of both the parties, and had" united with the defendants in their representation that three hundred and seventy shares of stock were held by the latter—deceiving alike both the plaintiffs and the defendants—and thereupon the plaintiffs-bad advanced their money to the defendants, I cannot perceive *490 that the claim of the plaintiffs to be reinstated in their former position would be less strong. The consideration moving between the plaintiffs and the defendants would still be precisely the same, and the position of the parties would be simply this: the fraud of the Schuylers has induced the mutual mistake under which the defendants have obtained the plaintiffs’ money. Both the plaintiffs and the defendants acted under the belief that they were dealing with actual stock. Each knew that the other was so dealing.
In this connection it is of some materiality to add, that up to the very close of the transaction, stock was the subject of the treaty. The plaintiffs were acting under the defendants’ representation that they held stock, and when-the evidence of title was produced it was in the name of the defendants; it had been transferred previously to them, and the certificate imported title in them. In this respect, it is not liable to the suggestion that the plaintiffs were dealing with, or received, or placed their reliance upon a certificate that Robert Schuyler had stock. They acted, and, as between these parties, they were warranted in acting, upon the double representation that the defendants had title to so much stock.
It was urged that the plaintiffs knew that they were dealing with pledgees who had received the supposed sureties from the Messrs. Schuylers, and that in the whole transaction, and especially in requiring the assent of the latter, they clearly indicated that they consented to do nothing, and that, in truth, they did do nothing, but transfer to the plaintiffs such interest and such property as they had.
Doubtless they might have so guarded their act, by reservations or qualifications, as to have rested safely in this view of the subject. But be it observed that this is not a mere question of warranty; the right of rescisión on the ground of mutual mistake, and the right to rescind for a breach of warranty, are not coincident. Here the thing in regard to which the parties supposed they were dealing had no existence. The plaintiffs were not buying a certificate, they were not proposing for a transfer of a certificate, down to the moment of closing the transaction they saw no certificate. Stock, and nothing else, was the subject of which they treated.
But suppose a pledgee, either in pursuance of his power to sell *491 the pledge for the satisfaction of his claim, or by the express assent of the pledgor, offers at public sale one hundred sacks of wheat, and even announces that he sells only his right, title, and interest therein as pledgee, and that the pledgor has assented to the sale— but he nevertheless calls the subject of the sale one hundred sacks of wheat—and on such sale he receives the money of the purchaser, who, when the sacks are delivered, finds their contents not wheat but some other article, it is not, I presume, doubted that the purchaser may recover back his money. How, although the transaction under consideration may not have been in fact, and may not have been regarded by the parties as a sale, it is not apparent to my mind that, in the principles affecting the right to rescind the arrangement, there is any thing which makes this case in that respect to differ from the other.
In this view of the subject, I regard it as of no importance that when the transaction was closed, the defendants wrote upon the notes, for which they held as security the supposed stock, a receipt in form, acknowledging payment from the plaintiffs, and so delivered them to the plaintiffs. This fact does not appear by the finding of the court, but it was proved without contradiction, and we may probably be at liberty to notice it. The only effect of this upon the plaintiffs’ rights, as against the Schuylers, was that their claim on the Schuylers would be for so much money paid to their use, and for this they would hold the supposed stock. And, on the other hand, on a rescisión of the transaction, the defendants, by the very facts here found, would be remitted to their original rights, according to the very terms of the notes themselves.
Again, the defendants are not prejudiced by a rescisión of the transaction; within ten days, the fraud of the Schuylers being discovered, the plaintiffs offered back the supposed stock. Ho change had occurred in the position of the parties. Ho insolvency had intervened, for the insolvency of the Schuylers was prior to the arrangement; and the full restoration of the defendants to their original position was the immediate effect of the return of the securities to them, in view of the discovery of the fraud which was then apparent.
I have only to add that, in my conclusion, I concur with that of the Judge at Special Term, in regard to the plaintiffs’ right to rescind this transaction, a conclusion of law which he did not deem *492 applicable, because he deemed the stock valid, though of less value than the parties supposed. The plaintiffs, in my opinion, did not obtain that for which they treated—they did not receive that which the defendants supposed they were giving. Both parties acted under a total misapprehension in regard to the subject to which the arrangement related, induced, it is true, by the fraud of another, but that was a fraud which had already been effectual to deceive the defendants, and had wrought all the prejudice it could effect upon them; and it was none the less a mistake because it originated in such a fraud.
The mutual error was in a particular vitally affecting the transaction, and but for the error the plaintiffs would have in nowise consented to it.
In my judgment, the case is within the rule requiring a restoration of the parties to their former position, and that the defendants should be adjudged to restore the money received, with interest, and receive back the supposed securities. This seems to me to accomplish what is most obviously just.
The reciprocal obligations of the plaintiffs, to restore also the $10,000 paid upon the check, make it only necessary to adjust the balance at $15,000, and interest, to be repaid by the defendants.